## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JON DAGENBACH, Individually and on Behalf of All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>      v.<br><br>BRAVO BRIO RESTAURANT GROUP, INC., ALTON DOODY, BRIAN O'MALLEY, THOMAS BALDWIN, JAMES GULMI, DAVID PITTAWAY, HAROLD ROSSER, FORTUNATO VELENTI,<br><br>                   Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**1. VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9**<br><br>**2. VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Jon Dagenbach ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and the other ordinary shareholders of Bravo Brio Restaurant Group, Inc. ("Bravo Brio" or the "Company"), except Defendants (defined below) and their affiliates, against Bravo Brio and the members of Bravo Brio's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Reg M-A Item 1015, 17 C.F.R. 229.1015 in connection with the proposed merger (the "Proposed Merger") between Bravo Brio,

and affiliates of Spice Private Equity (Bermuda) Ltd. and GP Investments, Ltd. (collectively, the "Consortium").

2.      On March 7, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the Consortium, pursuant to which, Bravo Brio shareholders will receive $4.05 in cash for each share of common stock they own (the "Merger Consideration").

3.      On, April 18, 2018, the Board authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act and setting a vote on May 22, 2018.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the Proxy, they have failed to disclose material information that is necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's financial projections; (ii) the valuation analyses performed by the Company's financial advisor Piper Jaffray & Co. ("Piper Jaffray"), in support of their fairness opinions; and (iii) Piper Jaffray's conflict of interest.

5.      It is imperative that the material information omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote on May 22, 2018, so that they can properly exercise their corporate suffrage rights.

6.      For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin

Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Bravo Brio shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Bravo Brio is incorporated in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

10.    Plaintiff is, and has been at all relevant times, the owner of Bravo Brio common stock and held such stock since prior to the wrongs complained of herein.

11.     Defendant Bravo Brio is an Ohio Corporation with its principle executive offices located at 777 Goodale Boulevard Suite 100, Columbus, Ohio 43212. Bravo Brio owns and operates Italian restaurants in the United States. It operates full-service Italian restaurants under the BRAVO! Cucina Italiana brand name; Italian chophouse restaurants under the BRIO Tuscan Grille brand name; and full-service American-French bistro restaurant under the Bon Vie brand name. The company's restaurants primarily offer Italian food and wine. Bravo Brio's common stock trades on the NASDAQ under the symbol "BBRG."

12.     Defendant Alton Doody is a director of Bravo Brio and is the Chairman of the Board since 1987.

13.     Individual Defendant Brian O' Malley is a director of Bravo Brio and is the President and CEO of the Company since 2015.

14.     Individual Defendant Thomas Baldwin is, and has been at all relevant times, a director of Bravo Brio since 2012.

15.     Individual Defendant James Gulmi is, and has been at all relevant times, a director of Bravo Brio since 2010.

16.     Individual Defendant David Pittaway is, and has been at all relevant times, a director of Bravo Brio since 2006.

17.     Individual Defendant Harold Rosser is, and has been at all relevant times, a director of Bravo Brio since 2006.

18.     Individual Defendant Fortunato Valenti is, and has been at all relevant times, a director of Bravo Brio since 2010.

19.     The defendants identified in paragraphs 11-18 are collectively referred to as the "Defendants".

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Bravo Brio common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

21.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of the close of business on April 17, 2018, Bravo Brio had an estimated 15,295,015 shares outstanding.

(b)     The holders of these shares are believed to be geographically dispersed through the United States;

(c)     There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

i.   Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

ii.  Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii. Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Merger as presently anticipated.

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### I.    Background and the Proposed Merger

22.    Bravo Brio is a company which is an owner and operator of two Italian restaurant brands, including BRAVO Cucina Italiana (BRAVO) and BRIO Tuscan Grille (BRIO). The Company operates approximately 120 restaurants in over 30 states. Additionally, approximately one BRIO restaurant is operated under a franchise agreement. It has over 110 operating locations, owns approximately four locations, of which over 100 are located adjacent to or in lifestyle centers and shopping malls, and over 10 are free-standing units.

23.    In the months leading up to announcement of the Proposed Merger, Bravo Brio repeatedly posted strong financial results. On August 3, 2018 the Company reported positive financial results for the Second Quarter of 2017. GAAP net income increased to $1.9 million, or $0.13 per diluted share, from a GAAP net loss of $(0.7) million, or $(0.04) per diluted share for the Second Quarter of 2016 and Restaurant-level operating profit increased 8.8% to $14.3 million from $13.1 million year-over-year. Defendant O'Malley added:

We are encouraged by the sequential improvement in comparable restaurant sales during the second quarter and particularly the strength of our banquet and off-premises channels, which grew 7.5% and 23.9%, respectively. Guests appreciate the new flavors and options introduced on our menus, are making greater use of our new and upgraded private dining facilities, and are ordering more food to-go for pick-up or delivery. Most importantly, the number of core restaurant locations with positive sales trends is growing."

During the latter half of the second quarter, we began cycling over the investments made last year that reaffirmed our brands as culinary food-forward destinations and ensured excellence in all elements of service and hospitality. This in turn has enabled us to significantly expand restaurant-level operating profit and adjusted EPS despite a modest decline in comparable restaurant sales.

We are pleased to be reiterating our guidance range for adjusted EPS. While the casual dining industry certainly remains challenging and volatile, our investments are now bearing fruit and have positioned us for greater profitability in the third and fourth quarters compared to last year.

24.     On March 8, 2018, Bravo Brio issued a press release to announce the Proposed

Merger stating as follows:

COLUMBUS, Ohio, March 08, 2018 (GLOBE NEWSWIRE) -- Bravo Brio Restaurant Group, Inc. (NASDAQ:BBRG) ("BBRG" or the "Company"), owner and operator of the BRAVO! Cucina Italiana and BRIO Tuscan Grille restaurant concepts, GP Investments, Ltd. ("GP"), a leading private equity and alternative investment firm, and its controlled company Spice Private Equity Ltd. ("Spice"), a Swiss investment company focused on private equity investments, today announced a merger agreement under which an affiliate of Spice will acquire the Company for a total enterprise value of approximately $100 million. The transaction proceeds will be funded by Spice, along with certain third party financing sources.

Under the terms of the merger agreement, BBRG's shareholders will receive $4.05 per share in cash. The purchase price represents a premium of approximately 37% over the volume weighted average price of the Company's shares for the 90-day period immediately preceding the date of the agreement. BBRG will report annual sales in excess of $400 million for the year ended December 31, 2017, and owns and operates 110 locations in 32 states across the country.

The merger agreement has been unanimously approved by BBRG's Board of Directors. The transaction is subject to shareholder approval and other customary closing conditions and is expected to be completed by the end of the second quarter of 2018.

"Our Board of Directors, in consultation with our outside advisors, has evaluated all options available to BBRG, and we are confident that this transaction maximizes

value for our shareholders," said Alton F. ("Rick") Doody III, Chairman of the Board of BBRG, "GP has a distinguished track record of being an active and valuable partner to its invested companies through its operationally-oriented approach, which we expect will greatly enhance our ability to maximize the potential of our Bravo Brio brands nationwide."

"Bravo Brio has two best-in-class Italian restaurant brands, an enduring culture, and a team committed to delivering exceptional dining experiences to its guests. We are pleased to be partnering with the Company and its leadership to build an even stronger foundation for value creation and profitable growth," said Antonio Bonchristiano, Chief Executive Officer of GP Investments, Ltd. "As a private entity, we will have greater flexibility to take a long-term view as we invest in Bravo Brio's future growth and expansion, which will drive rewards for the Company and our investors."

Upon closing of the transaction, BBRG will continue to be operated as an independent company and remain based in Columbus, Ohio.
Dechert LLP served as legal advisor and Piper Jaffray & Co. served as financial advisor to BBRG. Paul, Weiss, Rifkind, Wharton & Garrison LLP served as legal advisor to GP.

25. However, the $4.05 Merger Consideration is inadequate in light of Bravo Brio's recent financial performance and outlook. The Merger Consideration represents a 24% discount to Bravo Brio's 52-week high trading price of $5.30. Cash-out mergers, such as the Proposed Merger, usually offer significant premiums to a Company's trading price, not discounts.

26. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Merger.

## II. The Proxy Is Materially Incomplete and Misleading

27. On April 18, 2018, Bravo Brio filed the Proxy with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material

misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to cast an informed vote regarding Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

28. The First, the Proxy fails to provide unlevered free cash flow projections[1] for Bravo Brio. Unlevered free cash flows were utilized by Piper Jaffray in their valuation calculations, including their discounted cash flow analyses, and are material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the expected unlevered free cash flows? Without unlevered free cash flow projections, the Company's shareholders were not able to answer this question and assess the fairness of the Merger Consideration.

29. The projections included in the Proxy disclose Adjusted EBITDA without including projections for unlevered free cash flows. EBITDA is not a sufficient alternative to unlevered free cash flows—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are

---

[1]     Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

funded by the tooth fairy."[2]  Relying on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[3]  As a result of these material differences between EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company. Simply put, the unlevered free cash flow projections are material and merely supplying EBITDA renders the projections included in the Proxy misleading.

30.     The omission of the above-referenced projections renders the financial projections included in the Proxy materially incomplete and misleading. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

31.     With respect to Piper Jaffray's *Selected Public Companies Analysis* and *Selected Precedent Transactions Analysis* the Proxy fails to disclose the individual multiples for each company and transaction utilized in the analysis. The omission of these multiples renders the summary of the analyses and the corresponding implied equity value reference ranges materially misleading.  A fair summary of a companies analysis requires the disclosure of the individual multiples for each company; merely providing the high and low values that a banker applied is

---

[2]     Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[3]     Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price range.

32.     With respect to the Piper Jaffray's *Discounted Cash Flow* Analyses, the Proxy fails to disclose the following key components used in their analysis: (i) the values of the inputs and assumptions underlying the calculation of the *Scenario A* discount rate range of 19.2% to 21.2%; (ii) the values of the inputs and assumptions underlying the calculation of the *Scenario B* discount rate range of 17.0% to 19.0%; (iii) the inputs and assumptions underlying the selection of the exit multiple range  of 5.7x to 6.7x used to calculate the terminal values; and (iv) the actual terminal values calculated.

33.     These key inputs are material to Bravo Brio shareholders, and their omission renders the summary of the Piper Jaffray's Discounted Cash Flow Analyses incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" Id.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a

> fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

34.     Finally, the Proxy fails to quantify the compensation Piper Jaffray will receive for its role as sole and exclusive lead arranger in connection with a potential refinancing of the Company's credit facility. Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is also material to Bravo Brio shareholders. It is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have. This is especially true when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them—given their overall economic interest—than only approving a deal at truly fair price to shareholders.

35.     The Proxy merely states "Piper Jaffray is also currently engaged as sole and exclusive lead arranger in connection with a potential refinancing of the Company's credit facility and may receive fees for the rendering of such services." Proxy at 51. It does not disclose how much compensation Piper Jaffray stands to receive for its role as lead arranger or might be known

to receive in the future. The omission of the quantification of the compensation details from Piper Jaffray's concurrent roles with Bravo Brio renders the Piper Jaffray's fairness opinion and the included statement of fees materially incomplete and misleading, and in violation of 17 C.F.R. § 229.1015(b)(4).

36.     In sum, the omission the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I
### On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

37.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

38.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

39.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

40.     Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015.

41.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

42.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) the Company's financial projections; (ii) the valuation analyses performed by the Piper Jaffray in support of their fairness opinion; and (iii) Piper Jaffray's conflict of interest.

43.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

44.     Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information

identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for Bravo Brio and the details surrounding discussions with other interested parties and the Piper Jaffray. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review The Piper Jaffray's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

45.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of Bravo Brio's financial projections.

46.     Bravo Brio is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

47.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and will deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed Merger. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>COUNT II</u>

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     The Individual Defendants acted as controlling persons of Bravo Brio within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Bravo Brio, and participation in and/or awareness of the Bravo Brio's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Bravo Brio, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

50.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Bravo Brio, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Merger.  The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Merger.  The Individual Defendants were thus directly involved in the making of the Proxy.

52.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The

Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

55. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Merger, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 23, 2018                                   Respectfully submitted,

**OF COUNSEL**                                          /s/Daniel R. Karon
                                                        Daniel R. Karon (0069304)
**MONTEVERDE & ASSOCIATES PC**                          Beau D. Hollowell (0080704)
Juan E. Monteverde                                      **Karon LLC**
The Empire State Building                               700 West St. Clair Ave., Suite 200
350 Fifth Avenue, Suite 4405                            Cleveland, OH  44113
New York, NY 10118                                      PH: (216) 622-1851
Tel.: (212) 971-1341                                    FX: (216) 241-8175
Fax: (212) 202-7880                                     Email: dkaron@karonllc.com
Email: jmonteverde@monteverdelaw.com                            bhollowell@karonll.com

*Counsel for Plaintiff*                                 *Counsel for Plaintiff*